Filed 4/10/25  Gajanan v. City and County of San Francisco CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| GAJANAN INC. et al.,<br><br>     Plaintiffs and Respondents,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>     Defendants and Appellants. | A168328<br><br>(San Francisco County<br>Super. Ct. No. CGC16554309<br>[consolidated with<br>CGC16550351, CGC16550354,<br>CGC16554304]) |

At issue in this appeal is whether plaintiffs are entitled to an award of statutory attorney fees against the City and County of San Francisco.  The plaintiffs in this case own and operate six San Francisco boutique hotels.  In hard-fought litigation culminating in an eight-day bench trial, they successfully sued the City and County of San Francisco and its Office of the Treasurer and Tax Collector (collectively, the City) for refunds of $1.7 million in tax penalties.  We affirmed the trial court judgment for plaintiffs in *Gajanan Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780 (*Gajanan*).

Plaintiffs then sought an award of attorney fees under Code of Civil Procedure section 1021.5 (section 1021.5), which allows a successful party to recover fees in an action "which has resulted in the enforcement of an

1

important right affecting the public interest." After contested post-trial proceedings, including two hearings, the trial court awarded plaintiffs $5,265,562.50 in attorney fees under the statute. In the present appeal, the City argues that plaintiffs did not meet the statutory requirements that would entitle them to a fee award, that the award was in any event excessive, and that the trial court erred by considering supplemental declarations submitted by plaintiffs with their reply brief. We find no error and will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *Underlying Litigation and Appeal*

Plaintiffs are four hotel owners (AGPME Tenant LLC, KPH Management LLC, Mangal Inc., and Gajanan Inc.) and three management companies (Engage Hospitality LLC, Engage with Hospitality SF LLC, and Lombard Hospitality LLC). In the underlying litigation plaintiffs sought refunds of penalties the City assessed for failure to timely file hotel tax returns and pay hotel taxes. (*Gajanan*, *supra*, 77 Cal.App.5th at pp. 785-786.) After the plaintiffs filed the returns and paid the delinquent taxes and assessed penalties, they filed suit alleging they were entitled to refunds of the penalties under section 6.17-4 of the San Francisco Business and Tax Regulations Code, which at the relevant time "required the waiver of certain penalties when '[f]ailure to make timely payment or report of tax liability . . . occurred notwithstanding the exercise of ordinary care by the taxpayer.' "[1] (*Ibid.*, quoting S.F. Ord. No. 291-10, amending section 6.17-4.) Plaintiffs alleged that, exercising ordinary care, they had hired and relied on an

_____

[1] Except for "section 1021.5" (which refers to section 1021.5 of the Code of Civil Procedure), statutory references are to the San Francisco Business and Tax Regulations Code (the Code) as effective in 2014.

2

employee to file the returns and make the payments, only to learn after the taxes were past due that the employee was dishonest and had never filed the returns or paid the taxes. (*Ibid.*) Plaintiffs alleged that because they had exercised ordinary care, they were entitled under section 6.17-4 to refunds of penalties that had been assessed against them under sections 6.17-1, 6.17-2, and 6.17-3, which at that time imposed penalties for delinquent payment of tax, underreporting tax liability, and late filing of tax returns. (*Id.* at p. 789 & fn. 7.)

The City's position was that the term "ordinary care," which was not defined in the Code, should be interpreted consistent with the federal standard of "reasonable cause" in 26 United States Code section 6651(a)(1) in light of *United States v. Boyle* (1985) 469 U.S. 241, which held that " 'reasonable cause' requires more than just the exercise of ordinary care" and that reliance on an agent did not constitute reasonable cause under that statutory provision.[2] (*Gajanan, supra*, 77 Cal.App.5th at pp. 793-794.) The City also claimed that even if plaintiffs had shown ordinary care and were entitled to refunds of some penalties under section 6.17-4, they were not entitled to refunds of other penalties, which had been imposed under section 6.11-3, a provision that authorized the City to estimate tax liability if a taxpayer did not timely file a return or make payment and to add a 20 percent penalty (which was not subject to refund under section 6.17-4) to the estimated amount. (*Id.* at p. 789 & fn. 8.)

---

[2] The phrase "reasonable cause" did not appear in section 6.17-4 at the time relevant to plaintiffs' action. (*Gajanan, supra*, 77 Cal.App.5th at p. 794.) The phrase had appeared in the section before 2010, and was removed when the statute was amended in 2010. (*Id.* at p. 795.)

3

After an eight-day bench trial, the court found that plaintiffs had shown that they had exercised ordinary care; that the penalties at issue had been imposed under sections 6.17-1, 6.17-2, and 6.17-3; that section 6.11-3 was inapplicable under the facts of the case and the law; and that plaintiffs were therefore entitled to refunds of the penalties under section 6.17-4. (*Gajanan*, *supra*, 77 Cal.App.5th at pp. 790, 797-798.)  Judgment was entered for plaintiffs, and the City appealed.  (*Id.* at p. 791.)

We affirmed the trial court judgment in *Gajanan*.[3]  We interpreted section 6.17-4 and concluded that the phrase "ordinary care" used in that section was to be given its " ' "plain and commonsense meaning," ' " which was the meaning attributed to the phrase in the context of negligence. (*Gajanan*, *supra*, 77 Cal.App.5th at p. 793.)  Therefore, "ordinary care" meant " 'the degree of care that a prudent and competent person engaged in the same line of business or endeavor would exercise under similar circumstances.' " (*Ibid.*, quoting Black's Law Dict. (11th ed. 2019).)  We rejected the City's argument that the phrase "notwithstanding the exercise of ordinary care" in section 6.17-4 was to be interpreted as equivalent to "absent reasonable cause" in 26 United States Code section 6651.  (*Id.* at p. 794.)

As to the particular penalties at issue, we wrote that the City "was never clear about the statutory basis" for certain penalties it sought to impose on the plaintiffs (*Gajanan*, *supra*, 77 Cal.App.5th at p. 797), and that the City's interpretation of the Code "allow[ed] the City to make an arbitrary decision" as to whether to apply the penalty set forth in section 6.17-1, or the penalty set forth in section 6.11-3, or both penalties.  (*Id.* at p. 799 & fn. 21.)

---

[3] Our opinion was initially unpublished, but we ordered publication after receiving several requests and finding that for good cause and pursuant to California Rules of Court, rule 8.1105, the opinion should be published.

4

We concluded the section 6.11-3 and section 6.17-1 penalties applied in distinct circumstances. (*Ibid.*) We further concluded that, contrary to the City's argument that section 6.11-3 was the basis of some of the penalties at issue (which would have meant that those penalties were not subject to the refund provision of section 6.17-4), section 6.11-3 did not apply in the circumstances of this case. (*Id.* at pp. 799-800.)

Our Supreme Court denied the City's petition for review and request for depublication. (*Gajanan Inc. v. City and County of San Francisco* (Aug. 10, 2022, S274851).

B.      *Amendments to the San Francisco Business and Tax Regulations Code*

Several months after entry of the trial court judgment for plaintiffs, and while the City's appeal was pending, the City proposed amendments to the penalty and penalty waiver provisions of the Code, which were approved by the Board of Supervisors in September 2020. The penalty waiver provision in section 6.17-4 (which set out the "ordinary care" standard that the City had claimed meant "reasonable cause") was changed to state a "reasonable cause" standard. The amendments also significantly changed the penalty provisions: they eliminated the penalty in section 6.11-3, which had been disputed in the parties' litigation; eliminated a 20 percent penalty in section 6.17-1; simplified and consolidated the Code's penalty provisions; and reduced the possible maximum penalty from 130 percent to 25 percent, absent fraud or intention to evade the Code. In describing the 2020 amendments before they were enacted, the City stated that the proposed legislation was intended "to streamline the City's existing complicated tax penalty structure." The City acknowledged that "penalties administered under existing law resulted in unnecessarily harmful outcomes," and stated

5

that the 2020 amendments would "allow businesses to enjoy the benefits of a more streamlined and less punitive penalty structure."

The amended provisions, like the provisions at issue in the parties' litigation, apply to at least 15 different taxes and fees imposed by the City, including gross receipts tax, payroll tax, parking tax, and hotel taxes, and apply to thousands of registered businesses.

C.    *Plaintiffs' Request for Attorney Fees*

On September 20, 2022, plaintiffs filed a motion for an award of attorney fees under section 1021.5.  Plaintiffs sought $7,051,644, which they said was based on a $4,684,931 lodestar for litigation through trial, $681,031 lodestar for the appeal, and $322,813 for the time spent securing the fee award, at current market rates, discounted by 10 percent, with a multiplier of 1.4 applied to the fees incurred for the trial and appeal work.  Plaintiffs also requested "fees incurred subsequent to this filing as documented by Plaintiffs."

The motion was supported by seven declarations with numerous exhibits, which ran to almost 600 pages.  Yvonne Detert, the CEO and president of the plaintiff management companies that had employed the dishonest controller (*Gajanan, supra*, 77 Cal.App.5th at p. 786), stated in her declaration that she personally paid the penalties owed by the hotels to the City.  She further stated that she had been advised by two attorneys that litigation to recover the penalties would be expensive, risky, and could take many years to resolve.  She was referred to Amy Silverstein (plaintiffs' lead trial and appellate attorney), who also advised her of the risks and costs of litigation, including that fees and costs could outweigh any recovery.  Silverstein's firm, Silverstein & Pomerantz, agreed to represent plaintiffs based on a 20 percent contingent fee, and Detert stated she would not have

6

pursued the litigation absent the contingent fee arrangement. Silverstein's own detailed declaration addressed subjects including her firm's expertise in tax matters, the City's practices with regard to tax penalties and penalty waivers, the size and complexity of the litigation, and the fees incurred in litigating the case.

Plaintiffs also submitted declarations from four experienced San Francisco Bay Area tax attorneys who opined on the significance of plaintiffs' case, the competency of plaintiffs' counsel, and the appropriateness of the fees incurred and requested. Another attorney, Richard Pearl, the author of California Attorney Fee Awards (Cont. Ed. Bar., 3d ed.), which has been described as "a leading treatise on California attorney's fees" (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 409), stated in his declaration that the requested hourly rates for plaintiffs' counsel were within the range of reasonable rates charged by comparably qualified attorneys for comparable services; the number of hours requested was a reasonable number of hours for litigating the matter; and the 1.4 multiplier requested by plaintiffs for work on the trial and appeal appropriately reflected the risk counsel undertook by representing plaintiffs on an exclusively contingent basis.

D.    *City's Opposition*

In its opposition brief, filed on September 30, 2022, the City argued that plaintiffs were not entitled to attorney fees, the proposed lodestar was unreasonable, and a multiplier was not appropriate. The brief was supported by three declarations with numerous exhibits, which ran to over 2,300 pages. The City's counsel of record, Thomas Lakritz, testified in his declaration about the proceedings in the trial court. The City also submitted a declaration from Gary Greenfield, an attorney and the founder of a business that provides consulting services concerning legal fees, who was retained by

7

the City to analyze aspects of the plaintiffs' fee request. Greenfield calculated downward adjustments to plaintiffs' requested lodestar amounting to about $3 million, which left plaintiffs with fees amounting to about $2.1 million. The City submitted a declaration from Greg Kato, a City employee who had worked at the City's Office of the Treasurer and Tax Collector since 2010, but who had not been a trial witness. Kato described the City's policies and practices regarding tax penalties and waivers. The City filed 82 objections to plaintiffs' evidence.

E. *Plaintiffs' Reply*

Plaintiffs filed their reply brief and two supplemental declarations on October 6, 2022. The declarations and exhibits ran to more than 240 pages. A supplemental declaration from Silverstein addressed the arguments and evidence presented by the City in its opposition, including the assumptions underlying the opinions expressed in Greenfield's declaration; further explained plaintiffs' fee request and the work performed by plaintiffs' attorneys in the litigation; and outlined the work performed in preparing the reply papers. A supplemental declaration from plaintiffs' expert Pearl addressed the opinions expressed in Greenfield's declaration. Plaintiffs sought additional fees of $228,725, minus a 10 percent discount, for time spent on the fee motion since September 18, 2022, including time actually spent through October 6 and estimated time to prepare for and appear at the hearing. Plaintiffs filed responses to the City's 82 evidentiary objections, as well as 66 objections to the City's evidence.

F. *Hearing and Decision*

The trial court held a hearing on plaintiffs' motion on December 2 and 30, 2022.

On the morning of December 2, the court sent the parties its tentative rulings on the parties' evidentiary objections along with a one-page summary of its tentative ruling on the fee motion. The court concluded that plaintiffs were entitled to attorney fees under the statutory criteria, granted some of the downward adjustments requested by the City, and denied plaintiffs' request for a multiplier. At the hearing later that day, the court read an expanded version of its tentative ruling into the record and then asked whether either side wished to be heard. At that point the City objected to the supplemental declarations from Silverstein and Pearl, asked the court to strike the declarations and attached exhibits, and objected to the additional fees plaintiffs requested on reply. By then it was close to 5:00 p.m. The City's attorney said he required at least 15 minutes for his substantive argument, so the court continued the hearing to December 30.

At the continued hearing, the court heard argument from both parties. The City reiterated the objections it had made on December 2, and stated, "to the extent that the court relied on a supplemental declaration that's filed with a reply brief, the City objects and asks the court to strike the supplemental declaration."

In May 2023, the trial court issued a detailed and comprehensive 17-page fee order. The court discussed the statutory criteria for an award of fees and concluded that the plaintiffs satisfied each of them. The court also concluded that plaintiff's counsel's hourly rates were reasonable, and that subject to certain adjustments the hours spent in litigation were reasonable. The court declined to award plaintiffs a multiplier. In all, the court accepted $72,206.50 of the City's various downward adjustments to the plaintiffs' request for $5,337,769 in fees (an amount that reflects a 10 percent discount

9

but does not include a multiplier), and awarded $5,265,562.50 in fees. This appeal followed.

## DISCUSSION

### A. *Admission of Reply Declarations*

At the December 2022 hearing on plaintiffs' fee motion, the City objected to the supplemental declarations plaintiffs submitted with their reply papers on October 6, 2022, and asked the trial court to strike them. The City never filed a formal motion, asked to file a response, or sought a continuance to prepare a response. The court declined to strike the supplemental declarations, as reflected in its May 2023 order awarding attorney fees to plaintiffs, which lists the supplemental declarations and supporting exhibits among the documents it read and considered and includes citations to the Silverstein supplemental declaration.

The City argues that the trial court erred by accepting the reply declarations and asks that if we do not vacate the award in its entirety or instruct the trial court to reduce it, we should reverse and remand the matter with instructions to the trial court to give the City an opportunity to respond to the supplemental declarations in writing. Although the City never asked the trial court for a continuance or for permission to file a response to the reply declarations, the City asserts on appeal that it would have rebutted the statements in those declarations if it had been given the opportunity to respond.

We reverse a trial court's decision to accept new evidence with reply papers "only for a clear abuse of . . . discretion." (*Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 241 (*Carbajal*).) We find no abuse of discretion here.

10

Relying on the general rule that when a court permits a moving party to include additional evidence with a reply, " 'the other party should be given the opportunity to respond' " (*Carbajal, supra*, 245 Cal.App.4th at p. 241), the City contends that it should have been given the opportunity to respond to the new evidence in plaintiffs' reply declarations. But the City cites no authority suggesting that the trial court was required to invite the City to respond in the absence of any request from the City. *Roe v. Halbig* (2018) 29 Cal.App.5th 286 is instructive on this point. At a hearing that addressed a plaintiff's request for attorney fees, the defendant objected that the plaintiff did not provide detailed billing records to support the fee request until the reply brief. (*Id.* at p. 296.) On appeal, defendant argued that the trial court erred by considering information presented for the first time on reply. (*Id.* at p. 309.) The Court of Appeal noted that the court had discretion to consider the information provided with the reply, and concluded that defendant waived his challenge to the records by failing to request a continuance to address the additional information and by choosing not to argue the substance of the material at the hearing. (*Id.* at p. 310.)

Here, the City had plenty of time to seek to file its own supplemental declarations or request the opportunity to respond to plaintiffs' supplemental declarations between October 6, 2022, when the plaintiffs' declarations were filed, and the scheduled December 2022 hearing. The City did not do either of those things. And at both December hearings, the City asked the court to strike the supplemental declarations, but did not address the substance of the declarations or ask for an opportunity to respond to them. Under the circumstances we find no abuse of discretion by the trial court in considering the supplemental declarations.

11

B.     *Entitlement to Attorney Fees*

　　1.     *Applicable Law and Standard of Review*

Section 1021.5 authorizes the award of attorney fees to a successful party "in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery."  The party requesting fees bears the burden of demonstrating that each statutory element has been met.  (*Millview County Water Dist. v. State Water Resources Control Bd.* (2016) 4 Cal.App.5th 759, 769.)

"We review an attorney fee award under section 1021.5 generally for abuse of discretion.  Whether the statutory requirements have been satisfied so as to justify a fee award is a question committed to the discretion of the trial court, unless the question turns on statutory construction, which we review de novo."  (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 152 (*Collins*).)

We review the trial court's finding of facts critical to its decision for substantial evidence, which means " ' "[w]e accept the trial court's resolution of credibility and conflicting substantial evidence, and its choice of reasonable inferences that can be drawn from the evidence." ' "  (*City of San Clemente v. Department of Transportation* (2023) 92 Cal.App.5th 1131, 1149 (*San Clemente*).)  We do not reweigh the evidence.  (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581.)

2.    *Analysis*

There is no dispute that plaintiffs were the successful parties in this litigation.  Therefore, we consider whether the trial court abused its discretion in finding that plaintiffs met their burden to show their entitlement to attorney fees under the statute.

a.    *Enforcement of Important Right*

The trial court based its conclusion that plaintiffs' action resulted in the enforcement of an important right affecting the public interest on multiple grounds.  First, the action established that the standard for a tax penalty waiver under section 6.17-4 is "ordinary care," as stated in the statute, and not "reasonable cause" as the City had argued.  (*Gajanan*, *supra*, 77 Cal.App.5th at pp. 795-796.)  Second, the appellate opinion in *Gajanan* was published.  Third, the action clarified the conditions when certain penalties apply and exposed the City's apparently arbitrary decisions about when and whether to provide notice of delinquent tax.  Fourth, the plaintiffs' action prompted the City's 2020 legislative changes to the tax penalty scheme, which "replaced five penalties with only one, thereby eliminating . . . penalties that were confusing and overlapping" and decreased the maximum penalties from 130 percent to 25 percent.

Contending that plaintiffs' case did not enforce an important right affecting the public interest, the City offers arguments challenging the trial court's findings.  We find none of them persuasive.

i.    *Determination of the Penalty Waiver Standard*

The trial court concluded that the determination of the "ordinary care" penalty waiver standard enforced an important right affecting the public interest because the standard applies broadly to penalty waivers and was not limited to the facts of the plaintiffs' lawsuit.

13

The City contends that the court simply interpreted a statutory provision when it determined that the "ordinary care" penalty waiver standard of section 6.17-4 is different from a "reasonable cause" standard, and that "a decision merely interpreting a statute is not enough by itself" to constitute the enforcement of an important right. The City also contends that the decision was "narrow" and affects few, if any, taxpayers because it applied the penalty waiver standard to "specific facts." Indeed, in oral argument, the City tried to confine the import of the decision to cases involving boutique hotels with an errant employee who hid his failure to pay tax from his employers.

In characterizing the penalty waiver standard ruling as "narrow," the City relies on statements by Kato, a city employee, that he "can recall only one [other] instance" over his 12 years with the Office of the Treasurer and Tax Collector in which a waiver was requested on the grounds that a taxpayer's employee hid the fact that the employee had failed to file or pay taxes (he does not claim to have researched the issue) and that "there are no pending penalty waiver requests alleging that the taxpayer's failure to file a return or remit taxes was caused by an employee that hid the employee's failure to file or remit taxes from the taxpayer despite the taxpayer having reasonably hired the employee."

Although the trial court could not know for sure whether other waiver requests (including those that did not involve a deceptive employee) would have been granted under the *Gajanan* standard, the trial court had contrary evidence bearing on this issue from attorney Bradley Marsh, who stated in his declaration that he has represented "dozens" of taxpayers in disputes with the City and did not recall the City ever approving any of the many waiver requests he filed under the "ordinary care" standard (which is

14

consistent with the City's statements during discovery that established that waivers were rarely granted under the particular provision at issue), and he believed that many of the requests he filed would have been successful under the standard as established in *Gajanan*.[4]

Further, the City's argument ignores the fact that plaintiff's action did more than establish the correct standard for a penalty waiver under the "ordinary care" language of section 6.17-4. The action revealed that the City's interpretation of the "ordinary care" standard amount to application of a higher "reasonable cause" standard, even though "reasonable cause" language had been removed from the statute years before.[5] (*Gajanan, supra*, 77 Cal.App.5th at p. 795.) The City's interpretation was not disclosed to taxpayers until plaintiffs filed their action, as reflected in the Silverstein declaration, which stated that "[t]he City long hid the fact that it imposed this heightened [reasonable cause] standard on taxpayers by denying penalty waiver requests with no explanation, as it did with [p]laintiffs' requests in these cases." (See *State Bd. of Equalization v. Superior Court* (1992) 10 Cal.App.4th 1177, 1185-1186 [recognizing public interest in disclosing "an

---

[4] We are not persuaded by the City's argument that Marsh's statement as to his belief concerning the outcome of his client's cases is inadmissible speculation or conjecture.

[5] In a declaration submitted by the City in opposition to plaintiffs' motion for attorney fees, Kato stated that the City had always applied the "ordinary care" waiver standard as required by the *Gajanan* decision, and the only reason the waiver was denied by the City in plaintiffs' case is that the City did not believe that the taxpayers here had exercised the degree of care that a prudent and competent taxpayer would have exercised. The trial court could have discounted Kato's statements in light of the conflict between his declaration and the fact that throughout the underlying litigation the City argued that the appropriate standard for a penalty waiver was "reasonable cause." As we have noted, Kato did not testify at the trial.

15

agency's working law," which "promotes its accountability to the public and the consistent, predictable and nonarbitrary application and enforcement of the law"].)

### ii. *Publication of* Gajanan

The City contends that the publication of the opinion in *Gajanan* does not establish that the action enforced an important right affecting the public interest. As the trial court recognized, the fact that *Gajanan* was certified for publication is not dispositive on the issue. (*Serrano v. Stefan Merli Plastering Co., Inc.* (2011) 52 Cal.4th 1018, 1029 ["merely because an appellate opinion is certified for publication does not mean it involves an important right affecting the public interest"].) Nevertheless, the fact that litigation results in appellate precedent is a "factor to be considered in that regard" (*ibid.*) and constitutes "strong evidence" that "the underlying action 'vindicated an important right.' " (*Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 12; see also *Doe v. Westmont College* (2021) 60 Cal.App.5th 753, 764 ["publication of an opinion suggests that the case involved a matter of public importance"].) Accordingly, the trial court did not err in considering the publication of *Gajanan* as some evidence to support its conclusion that the action enforced an important right.

### iii. *Clarification of Penalty Provisions*

The trial court found evidence that the litigation enforced an important public right in the fact that the action clarified the conditions when the penalties in sections 6.11-3 and 6.17-1 apply, clarified that the estimate on which a penalty is based can be rebutted, and exposed the City's apparently arbitrary decisions about when and whether to provide notice of delinquent tax and which penalty assertedly applied. (*Gajanan, supra,* 77 Cal.App.5th at pp. 797-798.)

16

The City argues that clarifying the conditions under which the penalty provisions apply does not enforce an important right because the clarification will not apply to many other taxpayers. The City argues that because section 6.11-3 was eliminated in the 2020 amendments to the Code, any clarification will have no impact on taxes after January 1, 2021. The City also argues that "because" the dispute over the penalty provisions in *Gajanan* was limited to a few hotels over a period of eight months, it will "likely impact no other taxpayers with disputes remaining for the pre-2021 periods." The City's logic as to this second point is questionable. Although Kato stated in his declaration that the clarification was unlikely to affect many taxpayers, the trial court could have credited the plaintiffs' argument, based on the provisions of the Code and evidence from experienced tax attorneys, that the former statutes continue to apply to disputes as a result of the three-year statute of limitations for assessments; that taxpayers may extend the limitations period; that there is no limitations period if no return is filed; and that administrative appeals of tax assessments can last for several years, as can subsequent court proceedings.

In any event, the City reads *Gajanan* and the trial court's fee order too narrowly where the clarification and application of penalty provisions are concerned. As the trial court recognized, in addition to interpreting the penalty provisions and determining which provision applied, *Gajanan* "exposed the City's laissez-faire attitude" toward providing notice of delinquent taxes. (See *Gajanan*, *supra*, 77 Cal.App.5th at pp. 798-799 [noting "the City's seemingly arbitrary decisions whether and when to issue Notices of Determination" (which estimate the tax due and calculate a penalty based on the estimate) to taxpayers failing to timely file returns or pay taxes].) The City's argument is silent on this point. The plaintiffs' action also revealed

17

that the City's interpretation of the Code allowed the City to make arbitrary decisions about which penalty to apply or whether to apply two penalties in situations where a taxpayer filed a late return after receiving a "Notice of Determination" from the City. (*Id.* at p. 799, fn. 21.) It was therefore not error for the trial court to conclude that plaintiffs' action enforced important rights affecting the public interest. (See *Saleeby v. State Bar* (1985) 39 Cal.3d 547, 574 [protecting against " 'arbitrariness' in [a public agency's] decisionmaking" enforces an important right affecting the public interest].)

iv. *Amendments to Penalty Provisions in the Code*

In 2020, after the trial court ruled that plaintiffs were entitled to a refund of penalties, the City amended the penalty waiver statute to include "reasonable cause" language, an amendment the trial court viewed as a result of the litigation that provided the important benefit of "transparency about penalty waiver standards." At the same time the City also amended the Code to eliminate the penalty provision of section 6.11-3 altogether and to eliminate a penalty in section 6.17-1, both of which were at issue in the litigation. The trial court found that those amendments "replaced five penalties with only one, thereby eliminating . . . penalties that were confusing and overlapping" and decreased the maximum penalties from 130 percent to 25 percent, which resulted in the enforcement of an important right affecting the public interest. The trial court concluded that plaintiffs' lawsuit caused the City to make these beneficial Code amendments, finding that "[t]he timing and substance of the legislative changes seem too correlated to simply be a coincidence."

The City raises two primary arguments to contest the trial court's conclusion that plaintiffs' action led to the legislative amendments. We do not find them persuasive.

18

First, the City argues that no substantial evidence supports the trial court's conclusion that plaintiffs' case caused changes in the penalty provisions of the Code. But there is no dispute as to the sequence of events: several months after the trial court issued its decision in the underlying action, changes in the penalty provisions were proposed and adopted by the Board of Supervisors. The trial court could infer causation from the chronological sequence (*San Clemente, supra*, 92 Cal.App.5th at p. 1150), and it did so.

The City argues that it rebutted any inference of causation with evidence in Kato's declaration, but the trial court was not required to find Kato's declaration persuasive. Kato's declaration says very little about the legislative changes at issue. As to the standard for a waiver of penalties, Kato states that "[t]he impetus" for changing the penalty waiver standard was to have a standard "that taxpayers and their representatives would be familiar with because it is applied statewide," explaining that state law requires that the "reasonable cause" standard be applied to property tax penalties. But Kato does not acknowledge that in a 2010 amendment, the City had actually *eliminated* the purportedly "familiar" reasonable cause standard from section 6.17-4 (*Gajanan, supra*, 77 Cal.App.5th at p. 795), and did not reinstate the language until after plaintiffs prevailed at trial. As to the streamlining of the penalty provisions and reduction of total possible penalties, Kato states that in March 2014, almost two years before any of the plaintiffs here filed suit, "[e]fforts to streamline the penalty provisions" began with a review of the existing penalty structure, which "ultimately led" to the 2020 amendments. But Kato does not explain how that review that began in 2014 led to the 2020 amendments, nor does he discuss the impetus for or development of the elimination of the penalty provision in section 6.11-3 and

19

the reduction in the total amount of penalties that could be assessed. Moreover, contrary to the City's suggestion in its brief on appeal, Kato does not state that any of the 2020 amendments would have been adopted regardless of the litigation. Nor does he state that any of the 2020 amendments were contemplated before the commencement of this litigation in 2016.[6] Drawing all reasonable inferences in favor of the judgment, we conclude the trial court's finding is supported by substantial evidence.

Second, the City argues that fees are not available under section 1021.5 if the process of changing the law "was already well under way when the lawsuit was filed" in 2016. This argument is not supported by the evidence. The City's assertion that a review of "the penalty structure applicable to most San Francisco taxes" began in 2014 and "ultimately led" to the 2020 amendments does not compel a finding that the process of amending the statutes was "well under way" in 2016. Nor is such a finding compelled by the evidence from Kato's declaration that starting in March 2014 Kato was "involve[d]" in "policy discussions" with an unspecified individual or individuals "about the rationale for changing the City's penalty and penalty waiver provisions," which "culminat[ed] in a series of memoranda." The City provided no drafts of the 2020 amendments, nor any evidence that any

---

[6] Attached to Kato's declaration are four memoranda he prepared as part of the review process from July 2016 to December 2018. These memos have nothing to do with the changes that were enacted in the 2020 amendments and therefore are not persuasive evidence that the 2020 amendments had been underway before this litigation began. The memoranda compare the tax penalties imposed in different California jurisdictions and include information about the amount collected by the City in tax penalties. They do not refer to any sections of the Code; they say nothing about the standard for a penalty waiver; and they include no proposals for changing or eliminating penalty provisions or reducing the potential maximum penalty.

particular changes to the Code, including the changes encompassed in the 2020 amendments, were contemplated before plaintiffs filed suit.

As legal support for its second argument the City relies on *Westside Community for Independent Living, Inc v. Obledo* (1983) 33 Cal.3d 348. That case has no application here. *Westside Community* stands for the proposition that under the so-called "catalyst theory" a plaintiff who does not receive a favorable final judgment may nevertheless be considered a "successful party" for purposes of section 1021.5 if the plaintiff's action motivates the defendant to provide the relief that the plaintiff sought. (*Id.* at p. 353; see *Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604, 608 [absent a judgment in plaintiff's favor, plaintiff seeking attorney fees under § 1021.5 must show that "the lawsuit was a catalyst motivating the defendants to provide the primary relief sought"].) In *Westside Community*, plaintiffs sued to compel the issuance of regulations to implement a statute, and sought fees after proposed regulations were released. (33 Cal.3d at pp. 350-351.) But fees could not properly be awarded in that case because there was no causal connection between the plaintiff's action and the regulations: the record established that defendant had approved a final draft of the regulations even before the suit was filed. (*Id.* at p. 353.) Here the "catalyst theory" has no application because a final judgment was entered in plaintiffs' favor. Still, the City has not shown that the trial court erred when it considered the relationship between plaintiffs' action and the 2020 amendments to the Code in its analysis of whether plaintiffs showed their action involves an important right.[7]

---

[7] The City makes an additional argument, also dependent on the "catalyst theory," that is difficult to discern, but which appears to be that plaintiffs cannot establish any causal relationship between their lawsuit and the 2020 amendments because they did not seek legislative change in their

21

We conclude that the trial court did not err in finding that plaintiffs' action led to changes in the penalty provisions of the Code or in treating those changes as evidence to support its finding that plaintiffs' action enforced an important right affecting the public interest. More generally, the City fails to show that the trial court applied any incorrect legal standards or otherwise abused its discretion in determining that plaintiffs' action resulted in the enforcement of an important right affecting the public interest.

        b.     *Significant Benefit to the Public*

In addition to requiring that an action result in the enforcement of an important right, an award of fees under section 1021.5 requires "a significant benefit, whether pecuniary or non-pecuniary, . . . conferred on the general public or a large class of persons." (§ 1021.5, subd. (a).) In determining whether the "significant benefit" criterion is met, the trial court must make "a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 940 (*Woodland Hills*).)

The trial court found that "[t]he facts in *Gajanan* may be narrow but its application and the legislative changes it prompted are not." The court concluded that plaintiffs' action resulted in a significant benefit to a large class of people, specifically, taxpayers, by enforcing the Code causing the City to "clarify its legislative provisions and . . . amend the Business and Tax Code." In addition, the trial court found that taxpayers would "feel the important benefit of not being over-penalized and receiving tax penalty waivers to which they are entitled."

---

complaint and the trial court did not order it. As we have noted, this litigation did not result in an award of fees on a catalyst theory, so this inquiry is beside the point and we do not discuss this argument further.

The City argues that the "sole practical effect" of plaintiffs' action was to change the City's treatment of penalty waiver requests in the "very rare" circumstance that a taxpayer reasonably hired an employee who failed to pay taxes and hid that failure from the taxpayer before the 2020 amendments. This argument disregards the benefits to taxpayers in making transparent the City's application of the "ordinary care" penalty waiver standard and the City's interpretation of the interaction of the various penalty provisions. It also disregards the evidence that the former statutes continue to apply to disputes in light of the lengthy limitations periods and the protracted nature of tax litigation.

The City does not dispute that taxpayers benefited from the 2020 amendments to the Code that streamlined the penalty structure and made it less punitive, nor does the City dispute that these amendments benefit a large class of people. Instead, the City argues that these amendments do not support plaintiffs' request for fees because the amendments would have been adopted regardless of plaintiffs' litigation, an argument we have already rejected.

c.     *Necessity and Burden of Private Enforcement*

Another criterion for an award of attorney fees under section 1021.5 is "the necessity and financial burden of private enforcement." (§ 1021.5, subd. (b).)

Private enforcement unquestionably was necessary to raise the issues in this case. (*Bui v. Nguyen* (2014) 230 Cal.App.4th 1357, 1366 [in litigation "against the only agency that would bear the responsibility of complying with the . . . statutory right being asserted, necessity of private enforcement is manifest"].)

23

As for financial burden, an award of fees under section 1021.5, subdivision (b), is appropriate " 'when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his individual stake in the matter." ' " (*Woodland Hills*, *supra*, 23 Cal.3d at p. 941.) The financial burden analysis requires the court to compare two figures: "the monetary value of the benefits that the successful litigant reasonably expected at the time the vital litigation decisions were made [discounted] by the probability of success at that time" and the "litigation costs actually incurred, including attorney fees, expert witness fees, deposition costs and other expenses." (*Collins*, *supra*, 205 Cal.App.4th at pp. 154-155.)

Here, the plaintiffs came forward with evidence to support a finding that the discounted value of the case was considerably less than the $1.7 million that plaintiffs sought and eventually recovered. Detert stated in her declaration that she had been advised by lawyers at three law firms about the risks and prohibitive costs of litigation, and that she understood that even if she prevailed the fees and costs "could have easily outweighed any potential recovery." She pursued the case only because Silverstein's firm offered to represent her on a 20 percent contingency basis. Further evidence was provided in a declaration from Bradley Marsh (an attorney at a firm that Detert apparently did not consult), who stated that he has represented "dozens" of taxpayers in disputes with the City. Marsh opined that plaintiffs might well have recovered none, or only a part, of the refund they sought; that in view of the amount at issue and the complexity of the legal issues, no plaintiff would rationally pay on an hourly basis to litigate the case; and that if not for the possibility of a fee award under section 1021.5, the case would not have been economical to litigate. The trial court nonetheless focused on

24

the actual value of the case—the $1.7 million that plaintiffs sought and recovered—rather than calculating an estimated value of the case, which would have been less.

For litigation costs actually incurred, the trial court considered the total attorney fees incurred through the filing of plaintiffs' motion for fees, which amounted to $5,688,755. In light of the fact that the final cost of the case was about three times what plaintiffs could have expected to recover, the court determined that plaintiffs had shown that the financial burden analysis supported an award of fees.

We are not persuaded by the City's argument that the trial court applied an incorrect legal standard or otherwise abused its discretion in considering the issue of financial burden. The City cites *California Licensed Foresters Assn. v. State Bd. of Forestry* (1994) 30 Cal.App.4th 562, 570 for the proposition that entitlement to a fee award depends upon a comparison of a litigant's private interests with the "*anticipated* costs of suit" (italics added), and complains that the plaintiffs provided "no information" to allow the trial court to evaluate the anticipated costs of suit. Yet plaintiffs did provide information on this point to the court, including the declarations from Detert and Marsh discussed above. More important, the City disregards authorities holding that the relevant consideration is the actual cost of litigation. (See *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1215-1216 [weighing costs and benefits requires the court " 'to place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in th[e] case' "].) In short, the City has not shown that the trial court abused its discretion in weighing the value of the case against the cost of litigation, determining that " ' "the necessity for pursuing the lawsuit

25

placed a burden on [plaintiffs] 'out of proportion to [their] stake in the matter,' " ' " and judging that it was appropriate to award attorney fees to encourage this sort of litigation.  (*Ibid.*)

          d.     *Payment by Opposing Party in the Interest of Justice*

Finally, section 1021.5 requires the trial court to determine that fees "should not in the interest of justice be paid out of the recovery."  (§ 1021.5, subd. (c).)  "The absence of any specific guideline . . . and the reference to the 'interest of justice' indicate that the Legislature intended to grant the trial court the discretion to determine in what circumstances fees should be paid by the opposing party rather than from the recovery.  The court must exercise its discretion in accordance with the statutory objective of encouraging public interest litigation that would not be pursued absent the prospect of a fee award."  (*Collins, supra*, 205 Cal.App.4th at pp. 156-157.)  As the Court of Appeal concluded in *Collins*, "the 'interest of justice' inquiry . . . requires a value judgment similar to that involved in evaluating the 'financial burden of private enforcement' . . . as to the desirability of offering the bounty of a fee award in order to encourage similar litigation."  (*Id.* at p. 157.)  Accordingly, "[i]n some circumstances, the 'financial burden of private enforcement' inquiry may encompass the 'interest of justice' inquiry."  (*Ibid.*)

The trial court here, after quoting extensively from the *Collins* opinion, concluded that this was a case where the interest of justice inquiry was encompassed by the financial burden inquiry, and that its "value judgment" was that in the interest of justice fees should not be paid from plaintiffs' recovery.

The City offers a brief and unpersuasive argument on this point, contending that the trial court erred by failing to "do an independent review for this test," and rejecting the trial court's conclusion that the financial

26

burden inquiry encompassed the interest of justice inquiry as "insufficient." The City states that the court's inquiry was insufficient to determine whether plaintiffs' attorney fees should be paid from their recovery, but the City does not tell us what further inquiry it believes to be required. The City cites *Rider v. County of San Diego* (1992) 11 Cal.App.4th 1410, 1422, stating only that in that case attorney fees were denied in a tax refund matter. In *Rider*, the Court of Appeal concluded that the interest of justice inquiry required that the plaintiffs' attorney fees be paid from a recovered fund of invalidly collected sales tax revenues rather than from the general funds of the County or the Agency for which the revenues were collected. (*Id.* at pp. 1418, 1422.) The court's conclusion in *Rider* rested on two "factors" that were specific to that case (*id.* at p. 1422), but the City says nothing about those factors or how those factors or similar ones might apply in this case. We conclude the City has not met its burden to show that the trial court erred in concluding that in the interest of justice, plaintiffs' attorney fees here should be paid by the City.

Because the City fails to show that the trial court erred in finding that plaintiffs were entitled to recover their attorney fees, we turn to the City's challenge to the amount.

C.    *Amount of Fee Award*

The City contends that the trial court erred by not deducting fees for legal work performed by out-of-state attorneys, and by not deducting fees related to depositions, certain work on the fee motion, and certain work on discovery matters.

1.    *Applicable Law and Standard of Review*

Our Supreme Court has instructed that fees awarded under section 1021.5 "should be fully compensatory," and "should ordinarily include

27

compensation for *all* the hours *reasonably spent*, including those relating solely to the fee." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133 (*Ketchum*).) The trial court's determination of the amount of the award is based on a "lodestar," that is, "the hours expended by the attorney multiplied by that attorney's reasonable hourly rate." (*Sweetwater Union High School Dist. v. Julian Union Elementary School Dist.* (2019) 36 Cal.App.5th 970, 994.) "The party seeking attorney fees has 'the burden of showing that the fees incurred were "allowable," . . . "reasonably necessary to the conduct of the litigation," and . . . "reasonable in amount." ' " (*Ibid.*) The burden may be met by submitting " '[d]eclarations of counsel setting forth the reasonable hourly rate, the number of hours worked and the tasks performed.' " (*Ibid.*) The party need not " 'provide detailed billing timesheets.' " (*Ibid.*)

We review the amount of fees awarded under Code of Civil Procedure section 1021.5 for abuse of discretion. (*Ketchum*, *supra*, 24 Cal.4th at p. 1140.) " 'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong['] '— meaning that it abused its discretion." (*PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095, quoting *Serrano v. Priest* (1977) 20 Cal.3d 25, 49, and citing *Fed-Mart Corp. v. Pell Enterprises, Inc.* (1980) 111 Cal.App.3d 215, 228 [an appellate court will interfere with a determination of reasonable attorney fees " 'only where there has been a manifest abuse of discretion' "].) As we have explained, courts describe rulings that constitute an abuse of discretion as " 'exceed[ing] the bounds of reason' " or as "arbitrary, capricious, patently absurd, or even whimsical." (*Artus v. Gramercy Towers Condominium Assn.* (2022) 76 Cal.App.5th 1043, 1051.) "[O]ur Supreme Court said that 'A ruling that constitutes an abuse of

28

discretion has been described as one that is "so irrational or arbitrary that no reasonable person could agree with it." ' " (*Ibid.*, quoting *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

>     2.      *Fees for Work by Out-of-State Attorneys*

>             a.      *Additional Background*

Plaintiffs sought fees for work performed by Mark Medina and Neil Pomerantz, two Silverstein & Pomerantz partners who work in the firm's Denver office. Medina performed a total of 358.25 hours of work over the course of the case; Pomerantz performed just two hours of work related to the first appeal. Both attorneys are members of the State Bar of Colorado, but they are not members of the State Bar of California and were not admitted *pro hac vice* in this case. Plaintiffs presented evidence that the case was so complex that every lawyer in Silverstein & Pomerantz's San Francisco office was called to work on it, and that "because of the massive volume of work" they brought in additional lawyers, including Medina and Pomerantz.[8] Silverstein stated in her supplemental declaration that Medina and Pomerantz "handled some overflow work" from their office in Denver and that neither of them signed pleadings, appeared in court, or had any direct contact with the plaintiffs. By our calculation, their time amounted to less than five percent of the total amount of time for which plaintiffs sought attorney fees.

Relying on *Golba v. Dick's Sporting Goods, Inc.* (2015) 238 Cal.App.4th 1251 (*Golba*), the City argued that plaintiffs could not recover fees for work performed by Medina and Pomerantz, because in working on plaintiffs' case those attorneys engaged in the unauthorized practice of law in California.

---

[8] In their fee motion, plaintiffs represented that Silverstein & Pomerantz is a six-lawyer firm.

The trial court found that because Medina and Pomerantz performed "overflow work," rather than serving as lead counsel, and because they did not sign pleadings, attend court, or have direct contact with plaintiffs, they did not "practice law in California" (Bus. & Prof. Code, § 6125), and on that basis denied the City's request to deduct their fees from plaintiffs' fee award.

        b.    *Analysis*

The issue before us is whether the trial court abused its discretion in finding that Medina and Pomerantz did not practice law "in California" for purposes of the State Bar Act (Bus. & Prof. Code, § 6000, et seq.), which, as our Supreme Court has explained, was intended by the Legislature "to protect the public from those giving unauthorized legal advice and counsel." (*Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119, 129 (*Birbrower*).)

*Golba* explains that "[a] fundamental principle of California law, enshrined in the State Bar Act [citation], is that no person may 'practice law in California' unless that person is an active member of the State Bar. (Bus. & Prof. Code, § 6125 . . . .) As a corollary principle, no person may recover compensation for practicing law 'in California' unless that person was a member of the State Bar or admitted *pro hac vice* at the time the services were performed, or the legal services fall within an exception." (*Golba*, *supra*, 238 Cal.App.4th at p. 1255, citing *Birbrower*, *supra*, 17 Cal.4th at pp. 127, 136-137.)

Recognizing that the State Bar Act does "not define the meaning of 'in California' " (*Birbrower*, *supra*, 17 Cal.4th at p. 128), our Supreme Court addressed the issue as follows: "In our view, the practice of law 'in California' entails sufficient contact with the California client to render the nature of the legal service a clear legal representation. In addition to a quantitative

analysis, we must consider the nature of the unlicensed attorney's activities in the state. Mere fortuitous or attenuated contacts will not sustain a finding that the unlicensed lawyer practiced law 'in California.' *The primary inquiry is whether the unlicensed lawyer engaged in sufficient activities in the state, or created a continuing relationship with the California client that included legal duties and obligations.*" (*Ibid.,* italics added.)

The Supreme Court explained that in determining whether an unlicensed lawyer has practiced law "in California," physical presence in the state is not determinative. (*Birbrower, supra*, 17 Cal.4th at p. 128.) The court stated that an attorney not physically present in California may nevertheless practice law "in California" "by advising a California client on California law in connection with a California legal dispute by telephone, fax, computer, or other modern technological means." (*Id.* at pp. 128-129.) On the other hand, *Birbrower* "reject[s] the notion that a person *automatically* practices law 'in California' whenever that person practices California law anywhere or 'virtually' enters the state by telephone, fax, e-mail or satellite." (*Id.* at p. 129.) Ultimately, a court "must decide each case on its individual facts." (*Ibid.*)

We find it instructive to consider the facts of *Birbrower* and *Golba, supra*, 238 Cal.App.4th 1251, two cases on which the City relies in arguing that Medina and Pomerantz practiced law "in California" without authorization. Both cases concluded that out-of-state lawyers could not be compensated for practicing law in California (*Birbrower, supra*, 17 Cal.4th at p. 135; *Golba, supra*, 238 Cal.App.4th at p. 1265), but the facts of the cases differ significantly from each other and from the case before us.

*Birbrower* concerned fees billed under a fee agreement between a New York law firm and its California corporate client in connection with a

31

commercial dispute between the client corporation and a third party. (*Birbrower*, *supra*, 17 Cal.4th at pp. 124-125.) Attorneys from the New York firm who were not licensed to practice law in California traveled to California several times, where they discussed the dispute and strategies for resolving it with their client and its accountants, interviewed potential arbitrators, and met several times with representatives of the third party. (*Ibid.*) After the commercial dispute was resolved, the California client sued its New York attorneys for malpractice, who in turn cross-complained against their California client for over $1 million in attorney fees based on their fee agreement. (*Id.* at p. 126.) Our Supreme Court held that the fee agreement could not be enforced with respect to "the unauthorized legal services [the firm] performed in California" (*id.* at p. 135), which included not only the services performed by its attorneys while they were in California but also services they performed in New York for the client that involved the practice of law in California. (*Id.* at p. 138.) *Birbrower* concerned contractual attorney fees, not statutory fees, and *none* of the lawyers in that case were admitted to practice in California or had any connection to a California law firm. Unlike the case before us, the facts in *Birbrower* implicate the legislative intent underlying the State Bar Act, "to protect the public from those giving unauthorized legal advice and counsel." (*Id.* at p. 129.)

*Golba* concerned a motion for $210,000 in attorney fees and costs as part of a class action settlement. (*Golba, supra*, 238 Cal.App.4th at p. 1255.) The amount requested included $120,419 with a multiplier of 1.33, for two out-of-state attorneys. (*Id.* at pp. 1263-1264.) The Court of Appeal affirmed the trial court order denying the motion insofar as it pertained to fees for out-of-state counsel and awarding $11,000 for the work performed by counsel who were admitted to practice in California. (*Id.* at pp. 1270, 1273.) The out-of-

state lawyers for whom fees were denied were the lead counsel for the class (who had been retained by the plaintiff) and an associate in his firm, neither of whom was admitted to practice *pro hac vice.* (*Id.* at pp. 1264, 1268, 1269.) A California lawyer who acted as plaintiff's counsel of record in the case stated in a declaration that he and his firm were retained by the out-of-state lead counsel " 'because I have a California office.' " (*Id.* at pp. 1257, 1264.) The California lawyer's "sole function apparently was to act as local counsel under whose name and state bar number pleadings could be signed and filed until [lead counsel] was admitted *pro hac vice.*" (*Id.* at p. 1270.) And even though the out-of-state attorneys were never admitted *pro hac vice*, they nevertheless "performed most of the legal work in the case, including appearances at court." (*Id.* at pp. 1269-1270.) Here, in contrast, Detert retained a California attorney, Silverstein, as lead counsel. California attorneys performed the vast majority of the legal work in the case, and the out-of-state attorneys did not appear in court or have any direct contact with the client.

In arguing that the trial court erred in awarding fees for work performed by Medina and Pomerantz, the City focuses on their performing legal tasks and communicating with Silverstein by e-mail and telephone, while disregarding the fact that they had no contact with the clients. The City downplays the facts that Medina and Pomerantz performed relatively little work on the case (and did not appear in court or sign pleadings), that they both work in an office of Silverstein's firm, and that Silverstein was the lead counsel in the matter and actively involved in every phase of the case.[9] (See Pearl, Cal. Attorney Fee Awards (Cont. Ed. Bar, 3d ed. 2024) § 2.27, p. 2-

---

[9] Plaintiffs sought fees for 2,372.5 hours of work performed by Silverstein, 29 percent of the total hours for which fees were requested.

29 [limitations on the recovery of statutory attorney fees for work by out-of-state lawyers "generally do not apply to law firms with out-of-state offices in cases in which a California lawyer is of record and actively involved"].) We conclude that the City fails to show that the trial court abused its discretion in awarding fees for the work performed by Medina and Pomerantz.

   3.    *Fees for Depositions*

      a.    *Additional Background*

Plaintiffs sought fees for 1341.25 hours of work performed by five different attorneys related to depositions. The City took 21 depositions (including requiring each witness designated as a "person most knowledgeable" to testify at a separate deposition in his or her individual capacity) and plaintiffs took six depositions, including an expert witness and a "person most knowledgeable."[10]

In the trial court, the City observed that the total time for all depositions was 107 hours and 32 minutes, and argued that plaintiffs' unreasonably sought fees for more than 12.5 hours of preparation for each hour of actual time in a case that was neither novel nor complex; that plaintiffs improperly sought time for three attorneys who attended two deposition sessions and two attorneys who attended 13 sessions; and that it appeared that time billed by senior attorneys for depositions could have been done by lower-billing attorneys and that attorneys were doing secretarial and paralegal work in preparing for depositions. The City argued that it would be

_____

[10] Silverstein stated in her declaration that, "[i]n my experience, 21 depositions in a municipal tax case is unprecedented and excessive." Plaintiffs point to the number of depositions as just one example of what they characterize as "aggressive litigation tactics" on the part of the City, and assert that those tactics, combined with the complexity of the case, generated a "massive volume of work" for which plaintiffs incurred attorney fees.

reasonable to compensate the attorney who took the deposition for the time in deposition and for two hours of preparation for each hour of deposition, and that the fees should be reduced accordingly.

In its reply brief in the trial court, plaintiffs pointed out that the City's expert on fees, Greenfield, never opined that plaintiffs' deposition staffing or preparation time was excessive: he stated only that "the City's *counsel* contends that the time and fees billed [for deposition work] were substantially excessive." (Italics added.) In her supplemental declaration, Silverstein explained the time required to prepare for depositions by reference to the breadth of the notices for the person-most-knowledgeable depositions on both sides, the need to review large numbers of documents related to each witness, and, for plaintiffs' witnesses the need to explain the deposition process to the many witnesses who had never been deposed before, as well as the need to review documents and possible questions with witnesses.[11] Silverstein also explained that the time plaintiffs classified under the heading "depositions" included not only preparing for, taking, and defending the depositions that went forward, but also meeting and conferring as to the scheduling of depositions and related issues, work connected to motions pertaining to depositions, including multiple motions to compel and motions for protective orders, and preparing for depositions at which the City failed to produce a witness. Therefore, the City's calculation that plaintiffs spent 12.5 hours preparing for each hour of deposition time was incorrect.

The trial court concluded that the time spent on deposition preparation was reasonable, and declined to reduce the amount of fees associated with depositions.

---

[11] Over 36,000 pages of documents were produced in response to plaintiffs' and the City's discovery requests.

35

b.    *Analysis*

On appeal, the City raises the same arguments it made below with respect to depositions.  The City also argues that it was an abuse of discretion for the trial court to rely on the supplemental Silverstein declaration, and that in any event the declaration should have been found insufficient because it did not state which tasks were performed by which attorney.  In addition, the City points to federal district court cases in which between one and four hours of preparation per hour of deposition was found reasonable, suggesting that these cases have some bearing on this one, but without offering any discussion of their substance.

The City's arguments are not persuasive.  We have already rejected the City's argument that the trial court erred in considering the supplemental declarations that plaintiffs submitted to the court.  To the extent the City argues that the supplemental Silverstein declaration was inadequate, that argument has been forfeited because it was not raised below, when the City elected not to address the substance of the supplemental declaration.  (See *Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11 (*Newton*) [as a general matter " 'issues raised for the first time on appeal which were not litigated in the trial court are waived' "].)  Furthermore, the City's complaint about the "vague and abstract statements" in that declaration disregards the fact that with their fee motion the plaintiffs submitted detailed time records showing the work done by each of the attorneys whose time was classified as relating to "depositions."  The City also disregards the evidence in the supplemental declaration of plaintiffs' expert Pearl, who opined that "[i]t is common practice in the non-insurance defense world for two attorneys to attend depositions," and that for "key witnesses . . . staffing a deposition with three lawyers is perfectly normal and reasonable."  Pearl also opined that, based on

36

his review of the deposition transcript of the City's person most knowledgeable, "proper preparation for this deposition could easily have taken a week or more."

In sum, the City has not shown that the trial court abused its discretion in declining to reduce the number of hours for attorney work in connection with depositions.

### 4. *Fees for the Fee Motion*

#### a. *Additional Background*

Plaintiffs sought fees for 499.25 hours of work performed in connection with the fee motion through September 18, 2022. In their reply papers in the trial court, plaintiffs sought fees for an additional 312.5 hours of work from September 19, 2022 (the day before their fee motion was filed) forward. As stated in attorney Silverstein's supplemental declaration, this additional request reflected time spent on the fee motion and reply through October 6, 2022, the day on which the reply papers were filed, plus estimated time spent preparing for and appearing at the hearing on the motion. In connection with the reply papers, four attorneys worked full days, capped at 10 hours per day, "analyzing Mr. Kato's testimony and documents, analyzing the expert's calculations, preparing objections to the City's evidence, responding to the City's objections to evidence, working with [p]laintiffs' expert, drafting briefs, and performing research."

At the hearing on the fee motion, the City objected to any award of fees that were requested in plaintiffs' reply brief, on two grounds: first, plaintiffs could not recover a fee award greater than the amount requested in the notice of motion (a ground that the City has abandoned on appeal), and second, the fee request rested on an improper supplemental declaration, which the City argued should be stricken.

The trial court found that all of plaintiffs' requested fees for the fee motion were "justifiable and reasonable."

b.     *Analysis*

The City raises three arguments concerning the additional fee request that it did not make in the trial court: first, because plaintiffs failed to identify the four attorneys, the court could not determine whether their fees were calculated using the rates that the court had approved; second, a request for four attorneys working 10 hours a day for six days on the reply (from October 1 through October 6), which amounts to 240 hours, is excessive and unreasonable, and in the absence of plaintiffs identifying the specific tasks performed by each attorney, the court "cannot know whether the billings are duplicative, excessive, necessary"; and third, plaintiffs sought 72.5 hours to prepare for the hearing, but because plaintiffs failed to explain why they needed that much time, the court could not determine whether the time was reasonable or necessary.[12]

The City could not have raised these three issues in its opposition to plaintiffs' motion, but it could have raised them at the hearing or sought permission to address them in a surreply, and it failed to do so. As we have noted, instead of addressing the substance of the Silverstein declaration (on which plaintiffs relied in seeking fees for the reply), the City elected to argue only that the declaration should be stricken. These arguments have been

_____

[12] Because plaintiffs sought fees for 312.5 hours of work in connection with the reply, including up to 240 hours for work on the reply brief, the City apparently assumes that the remaining 72.5 hours were spent in preparation for the hearing. The City disregards plaintiffs' explanation that the time requested covered work performed after September 18 in preparing the fee motion (which was filed on September 20) as well as preparation for the hearing.

38

forfeited because they were not raised in the trial court. (*Newton*, *supra*, 110 Cal.App.4th at p. 11.) We need not discuss them, but in any event we do not find them persuasive.

There was sufficient evidence before the trial court to support its determination that the fee request was reasonable. The requested hours included work on the fee motion after September 18; time for preparing the reply papers, which required plaintiffs' attorneys to address over 2,000 pages of declarations and exhibits from plaintiffs, as well as respond to more than 80 objections to the plaintiffs' evidence; and estimated time to prepare for and attend the fee hearing. Plaintiffs provided evidence as to the specific tasks performed by the attorneys to prepare the reply filing, as well as information about the attorneys who worked on the fee motion and their billing rates. The absence of time sheets is not fatal to plaintiffs' request: "[t]he law is clear . . . that an award of attorney fees may be based on counsel's declarations, without production of detailed time records." (*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1375 [affirming fee award where plaintiff's attorneys provided declarations explaining the work provided].) In the face of this evidence, the City has not shown that the trial court abused its discretion in awarding plaintiffs' requested fees for work after the fee motion was filed.

5. *Fees for Discovery*

As part of its argument in the trial court that plaintiffs' hours were excessive and unreasonable, the City pointed out that 186.75 hours and $109,777.59 in plaintiffs' requested fees were associated with billing entries for "work on discovery." The City requested a 20 percent reduction of the fees associated with those entries, amounting to $21,955.52, on the grounds that the entries were "so vague or general" that it was not possible to determine

39

what the work related to or whether it was reasonable. The trial court granted the City's request. Now the City wants more.

In its appellate briefs, the City does not acknowledge that it sought and received a 20 percent reduction to the "work on discovery" entries. Instead, the City argues for the first time that plaintiffs should not have received any of the fees they sought in connection with the "work on discovery" time entries and that the trial court should have deducted the full $109,777.50. This claim has been forfeited because it was not made in the trial court, and we decline to address it. (*Newton*, *supra*, 110 Cal.App.4th at p. 11 [" '[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court' "].)

## DISPOSITION

The challenged order is affirmed. Plaintiffs shall recover their costs on appeal.

_____
Miller, J.

WE CONCUR:


_____
Richman, Acting P. J.


_____
Desautels, J.


A168328, *Gajanan, Inc. v. City and County of San Francisco et al.*